NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0285n.06

No. 18-6121

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FRED ROBINSON, ASHLEY SPRAGUE, and
JOHNNY GIBBS, on behalf of themselves and all
others similarly situated,

        Plaintiffs-Appellees,

v.

JEFF LONG,
Commissioner of the Tennessee Department of
Safety and Homeland Security, in his official
capacity,

        Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
May 20, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

BEFORE:    COLE, Chief Judge; BOGGS and SUTTON, Circuit Judges.

BOGGS, Circuit Judge.  Tennessee law permits the state to suspend the driver's licenses of individuals who have failed to pay fines associated with certain traffic violations.  Plaintiffs-appellees sued to enjoin the policy and the district court granted a preliminary injunction, ruling that the policy violated the Fourteenth Amendment.  During the pendency of this appeal, we decided *Fowler v. Benson*, 924 F.3d 247, 252 (6th Cir. 2019), which held that Michigan's policy of suspending driver's licenses for unpaid traffic fines "does not run afoul of the Fourteenth Amendment."  Because Tennessee's policy is nearly identical to Michigan's policy, *Fowler* governs the disposition of this case.  We therefore reverse the district court's grant of a preliminary injunction.

### I.  Background

Tennessee Code Annotated § 55-50-502(a)(1)(H) authorizes Tennessee's Department of Safety and Homeland Security to suspend the driver's license of any individual who "[h]as been

finally convicted of any driving offense in any court and has not paid or secured any fine or costs imposed for that offense[.]"[1] The three named plaintiffs in this suit have all had their licenses suspended for such nonpayment, and claim that they are representative of a class of over 34,000 Tennesseans who have had their licenses suspended and cannot pay to reinstate them.[2] The record shows that at all times between 2014 and 2018, there were more than 250,000 licenses suspended due to nonpayment of such traffic debt, and that as of 2018, there were 610,669 unresolved suspensions (some drivers have multiple unresolved suspensions).

The plaintiffs filed suit under 42 U.S.C. § 1983, seeking to enjoin Tennessee from "suspending driver's licenses without providing notice and without considering ability to pay[.]" After the district court denied Tennessee's motion to dismiss and certified the class, the plaintiffs moved for a preliminary injunction. In evaluating the plaintiff's motion, the district court first explained that the license-suspension policy imposed a harsher sanction on indigent drivers than

---

[1] The full statutory provision at the time of the plaintiffs' suspensions stated:

> The department [of Safety and Homeland Security] is authorized to suspend the license of an operator or chauffeur upon a showing by its records or other sufficient evidence that the licensee: . . . (H) Has been finally convicted of any driving offense in any court and has not paid or secured any fine or costs imposed for that offense; provided, however, that, in any county having a population of not less than eight hundred ninety-seven thousand four hundred (897,400) nor more than eight hundred ninety-seven thousand five hundred (897,500), according to the 2000 federal census or any subsequent federal census, prior to the suspension of a license, the local court or court clerk of the jurisdiction shall offer an installment payment plan, and for so long as the licensee complies with the plan, the department may not suspend the license pursuant to this subdivision (a)(1)(H). Tenn. Code Ann. § 55-50-502(a)(1)(H).

During the pendency of this appeal, Tennessee amended Tenn. Code Ann. § 55-50-502 to allow the possibility of creating a payment plan for those who request one. This change does not moot this appeal, however, because the plaintiffs suggest that the amended statute is still unconstitutional as it does not provide an ability-to-pay hearing.

[2] Fred Robinson owes $441 in traffic fines for speeding and for failing to maintain valid insurance. To recover his license, he must pay the debt as well as an additional $323 "reinstatement fee." Robinson attests that he cannot pay the $764 that he owes in total because he receives only $759 in Social Security Disability payments each month. Ashley Sprague's license was first suspended in 2016 due to nonpayment of $477.50 in traffic tickets. Since then, she has received additional tickets for failing to have proof of insurance and for driving on a suspended license. To recover her license, she now owes $946 in fines and a $388 reinstatement fee, totaling $1,334. Sprague attests that she cannot pay the full amount because she is a single mother of five children and her job only pays minimum wage. Plaintiff Johnny Gibbs owes a total of $1,382.50 for fines dating back to 2002 and for his reinstatement fee. He attests that he cannot pay the fees because he earns only around $30 to $40 per week because he cannot obtain consistent work without a license.

on non-indigent ones. Although the court recognized that rational-basis review generally applies to distinctions based on indigency, it reasoned that a "more searching inquiry" should apply to the license-suspension policy because it threatened to "exacerbate the indigents' poverty." The district court reasoned that, regardless of the level of scrutiny, the policy was not rationally related to Tennessee's stated goals of debt collection or traffic safety, because "[a] driver's license suspension cannot coerce an indigent person into paying his traffic debt," and because "safety and risk bear no relationship to the [wealth-based] distinction" created by the statute. The district court therefore concluded that the policy was unconstitutional and granted the preliminary injunction.

While Tennessee's appeal was pending, we decided *Fowler v. Benson*, in which we held that a nearly identical license-suspension policy from Michigan was constitutional. 924 F.3d at 252. Both the Tennessee and Michigan policies permit the state to suspend the driver's license of individuals who have failed to pay a "fine" or "cost" associated with certain driving offenses. *See* Tenn. Code Ann. § 55-50-502(a)(1)(H); Mich. Comp. Law § 257.321a(2). Neither scheme creates an exception for drivers who are unable to pay the fines, and neither policy requires the state to consider a driver's ability to pay before assessing the suspension. Because of the policies' similarities, *Fowler* considered many of the same issues that are presented in this appeal. For example, *Fowler* considered whether Michigan's policy constituted "impermissible wealth discrimination" and whether a court should review the policy under heightened scrutiny. *Fowler*, 924 F.3d at 260. *Fowler* also considered whether the policy violated the plaintiffs' proffered "rights against extraordinary debt collection" under the Supreme Court's decision in *James v. Strange*, 407 U.S. 128 (1972). *Ibid*. Ultimately, *Fowler* held that Michigan's license-suspension policy "does not run afoul of the Fourteenth Amendment" and reversed a district court's

enjoinment of the policy. *Id*. at 252. Following *Fowler*, Tennessee sought and received a stay of the injunction, meaning that on appeal, the plaintiffs are asking that the injunction be reinstated.

## II. Discussion

A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right[.]" *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). Generally, "[w]e measure the validity of the district court's injunction by reference to four criteria:

> (1) whether the movant has a strong likelihood of success on the merits;
> [ (2) ] whether the movant would suffer irreparable injury without the injunction;
> (3) whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by the issuance of the injunction.

*Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013) (brackets in original). Yet when the preliminary injunction is granted "on the basis of a potential constitutional violation," as is the case here, "the likelihood of success on the merits will often be the determinative factor," which is a question of law that we review de novo. *Ibid.*

On the merits, the parties primarily dispute the relevance of *Fowler*, and whether it should govern the disposition of this appeal. *Fowler* is a published opinion that was decided a little more than a year ago. It evaluated a nearly identical license-suspension policy from Michigan and considered many of the same issues presented in this appeal. It must therefore serve as the basis by which this appeal is evaluated. Notably, plaintiffs do not argue that the Tennessee and Michigan policies are distinguishable. Instead, they contend that we should not rely on *Fowler* because the opinion misinterpreted several key Supreme Court and Sixth Circuit precedents. However, we are "duty-bound to apply governing precedent," *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 571 (6th Cir. 2019), and "a departure from controlling precedent 'demands special justification.'" *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018) (citation omitted). "[A] published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States

Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *Sykes v. Anderson*, 625 F.3d 294, 319 (6th Cir. 2010) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)).

Moreover, many of the plaintiffs' arguments for why *Fowler* was wrongly decided simply restate the same arguments that were presented in that case. For example, plaintiffs claim that Tennessee's license-suspension policy constitutes impermissible wealth discrimination under *Griffin v. Illinois*, 351 U.S. 12 (1956), and its progeny, and also claim that the policy runs afoul of the Supreme Court's prohibition against extraordinary debt collection as articulated in *James v. Strange*. We considered and *rejected* both arguments in *Fowler*. *See Fowler*, 924 F.3d at 260–61.

Plaintiffs do make one novel argument in an attempt to distinguish *Fowler*. They argue that the Supreme Court's decision in *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), requires us to evaluate wealth-based distinctions with heightened scrutiny even outside of the criminal-justice context. *M.L.B.* involved a Mississippi mother who was unable to appeal the termination of her parental rights because she could not afford the record-preparation fees necessary for the appeal. *Id.* at 109. The Supreme Court, after applying heightened scrutiny, held that Mississippi's policy of not allowing the mother to appeal *in forma pauperis* was unconstitutional. *Id.* at 127. In the plaintiffs' view, *M.L.B.* requires us to evaluate Tennessee's license-suspension policy under heightened scrutiny. But plaintiffs ignore the fact that *M.L.B.* took pains to note that the termination of parental rights creates "a unique kind of deprivation" that is not true of other civil penalties. *Ibid.* (quoting *Lassiter v. Dep't. of Soc. Servs. of Durham Cty.*, 452 U.S. 18, 27 (1981)). In fact, the Supreme Court has consistently "recogniz[ed] that parental termination decrees are among the most severe forms of state action" and that cases dealing with parental-rights terminations, "*have not served as precedent in other areas.*" *Id.* at 128 (emphasis added). Given the sharp difference

in severity between a termination of parental rights and the suspension of one's driver's license, the plaintiffs' reliance on *M.L.B.* in an effort to undercut *Fowler* is misplaced.

In short, plaintiffs present no valid reason for us to depart from *Fowler's* conclusion that "[w]e review equal protection challenges to laws on grounds of 'wealth-classification' only to see if they have a rational basis." *Fowler*, 924 F.3d. at 261. And *Fowler* also controls our review of the license-suspension policy for a rational basis. One of Tennessee's stated goals for the policy is to encourage the payment of unpaid traffic fines. States have "legitimate interests in promoting compliance with court orders and in collecting traffic debt" and a state's "choice to wield the cudgel of driver's-license suspension for nonpayment of court debt dramatically heightens the incentive to pay." *Id*. at 262–63. Plaintiffs arrived at their present position only after ignoring earlier opportunities that many violators of traffic rules have utilized. The rationale for upholding the Michigan scheme applies with equal force to the Tennessee one. Accordingly, we hold that Tennessee's license-suspension policy is constitutional, and that the district court abused its discretion by committing an error of law in enjoining the policy.

* * *

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

COLE, Chief Judge, concurring.  I concur in judgment in light of the fact that *Fowler v. Benson*, 924 F.3d 247 (6th Cir. 2019), is binding precedent in this circuit.  Because I believe that *Fowler* was wrongly decided, I write separately to note that if we were not constrained by *Fowler*, I would affirm the district court's order granting a preliminary injunction.

Even under rational basis review, the challenged law is unconstitutional as applied to the certified plaintiff class, which consists only of Tennessee residents "who cannot now and could not at the time of [their license] suspension afford to pay [their traffic] debt."  (Dist. Ct. Op. re Class Cert., R. 151, PageID 2311, 2403.)  Taking away residents' driver's licenses as punishment for their poverty furthers no legitimate government interest.  It actively impedes the ability of the state to collect, as it hinders the ability of residents to earn money to pay their debt.  *See, e.g.*, *Tate v. Short*, 401 U.S. 395, 399 (1971) (finding that imprisoning drivers too poor to pay traffic fines, while ostensibly "imposed to augment the State's revenues," "obviously" impedes that purpose rather than serving it).  The idea that license suspension will encourage indigent residents to pay their traffic debt is irrational.  *See Fowler*, 924 F.3d at 272 (Donald, J., dissenting) ("It is difficult to rationalize. . . how suspending the driver's license of a person who is truly unable to pay makes it any more likely that [the state] will recover the costs it seeks to collect."); *see also, e.g.*, *Bearden v. Georgia*, 461 U.S. 660, 670 (1983) ("Revoking the probation of someone who through no fault of his own is unable to make restitution will not make restitution suddenly forthcoming.").  Attempting to incentivize impoverished Tennessee residents to pay traffic debt by suspending their licenses is like trying to squeeze blood from a stone.  Nothing will come but pain.

It is no answer to say that the presently impoverished plaintiffs may, at some unknown future time, come into money, and the current suspension of their driver's licenses will incentivize them, at that time, to pay this debt before all others.  *Cf. Fowler*, 924 F.3d at 263.  From the moment

the plaintiffs' driver's licenses are taken away until that hypothetical, future time when they acquire excess funds, their constitutional rights are violated by the state's withholding of a vital property interest on the sole basis that they are too poor to pay. *See, e.g.*, *Cleveland v. United States*, 531 U.S. 12, 25 n.4 (2000) (explaining that "individuals have constitutionally protected property interests in state-issued [driver's] licenses") (citing *Bell v. Burson*, 402 U.S. 535, 539 (1971)); *Bearden*, 461 U.S. at 671 (rejecting the notion that a state can "punish[] a person for his poverty"). While the plaintiffs remain indigent, offering them the opportunity to pay a fine or have their license taken away is an "illusory choice," as an "indigent [person], by definition, is without funds." *Williams v. Illinois*, 399 U.S. 235, 242 (1970).

Nor is it an answer to say that the suspension of the plaintiffs' licenses furthers the state's interest in compliance with traffic laws. *Cf. Fowler*, 924 F.3d at 262. Other Tennessee residents, who violated those same traffic laws, were able to keep their driver's licenses upon payment of a fine. The only difference between those residents and the plaintiffs is that the plaintiffs are too impoverished to pay. A state cannot impose a harsher punishment on one resident than another for the same offense on the sole basis that one is unable to pay a fine. *See Williams*, 399 U.S. at 242; *Tate*, 401 U.S. at 399. Just as "the ability to pay costs. . . bears no rational relationship to a [criminal] defendant's guilt or innocence," the ability to pay fines bears no rational relationship to a resident's fitness to drive. *See Griffin v. Illinois*, 351 U.S. 12, 17–18 (1956) (plurality).

By vacating the district court's preliminary injunction, we allow Tennessee to deprive thousands of residents of their only means of obtaining food, accessing medical care, or getting to work. *See Bell*, 402 U.S. at 539 (describing driver's licenses as "essential in the pursuit of a livelihood"). The district court found that for most Tennessee residents, "public transportation . . . is widely insufficient to provide an adequate substitute for access to private motor vehicle

transportation." (Dist. Ct. Op. re Prelim. Inj., R. 222, PageID 4003–04.) Stripping people of their driver's licenses because of their inability to pay is not only cruel and unwise; it is unconstitutional. I regret that, until a change comes from the en banc court or the Supreme Court, *Fowler* forecloses us from rectifying this injustice.