RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

ADRIAN FOWLER; KITIA HARRIS, on behalf of themselves and others similarly situated,

*Plaintiffs-Appellees*,

*v.*

Nos. 17-2504/18-1089

JOCELYN BENSON, Michigan Secretary of State, in her official capacity,

*Defendant-Appellant*.

─────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:17-cv-11441—Linda V. Parker, District Judge.

Argued:  October 3, 2018

Decided and Filed:  May 8, 2019

Before:  BATCHELDER, DONALD, and THAPAR, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  John G. Fedynsky, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant.  Phil Telfeyan, EQUAL JUSTICE UNDER LAW, Washington, D.C., for Appellees.  **ON BRIEF:**  John G. Fedynsky, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant.  Phil Telfeyan, Rebecca Ramaswamy, EQUAL JUSTICE UNDER LAW, Washington, D.C., John C. Philo, MAURICE & JANE SUGAR LAW CENTER FOR ECONOMIC & SOCIAL JUSTICE, Detroit, Michigan, for Appellees.

BATCHELDER, J., delivered the opinion of the court in which THAPAR, J., joined. DONALD, J. (pp. 19–30), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

ALICE M. BATCHELDER, Circuit Judge.  This is a case about the constitutionality of Michigan's driver's-license suspension scheme, as applied to indigent drivers.  Plaintiffs claim that the Michigan Secretary of State's suspension of an indigent person's driver's license, on the basis of unpaid court debt, violates the Fourteenth Amendment.  Plaintiffs contend that suspending the driver's licenses of the poor is irrational because license suspension makes their commuting to and from work, for instance, much harder, and therefore reduces the chances that they will pay the debt.  Whatever merit Plaintiffs' argument might have as a matter of policy, its merit as a constitutional argument is diminished by the fact that our review of state legislative choices in this arena is markedly deferential.  Because Plaintiffs have not shown that Michigan's legal scheme is devoid of a rational basis, we decline Plaintiffs' invitation to etch their preferred driver's-license policy into constitutional bedrock.

The district court granted Plaintiffs' motion to enjoin Michigan's Secretary of State from enforcing Michigan's driver's-license suspension law.  Because we find that the Secretary's enforcement of Michigan law does not run afoul of the Fourteenth Amendment, we **REVERSE**.

**I.**

Adrian Fowler and Kitia Harris ("Plaintiffs") are Michigan residents who claim that their driver's licenses were suspended due to their inability to pay court debt.[1]  Fowler lived in Georgia between 2008 and 2012, where she acquired three tickets for civil infractions.  She has not paid the court debt associated with those tickets.  In 2012, after moving to Michigan, Fowler attempted to renew her Michigan driver's license, but was unable to do so because she had outstanding court debts in Georgia.  In 2013, Fowler was cited for driving with a suspended license as well as speeding.  Fowler claims that she went to the Ferndale, Michigan, court to explain that she could not pay the costs associated with her ticket—nearly $600—and was told

---

[1]We refer to court debt as a catch-all term for fines, court costs, fees, or assessments identified under Michigan Compiled Laws § 257.321a.

that if she did not return in three weeks with full payment, a warrant would be issued for her arrest.

Fowler works 20 hours a week making $8.90 per hour. She claims that she lacks the resources to repay her court debts. Fowler claims that she is unable to find good-paying work as a result of her suspended license because many desirable jobs require a commute for which there is no reliable public transit.

Harris was ticketed in Michigan in 2016 for "impeding traffic." She claims that the citing officer told her to call a particular phone number to determine the amount she owed for the ticket. Harris called the number (which put her in touch with the Michigan 43rd District Court-Ferndale Division) and was told that she owed $150. Because she could not make that payment, Harris claims, she asked if she could be placed on a payment program, but was told that she could not, and that if she waited too long to pay off the ticket, her driver's license would be suspended. Roughly a month after her phone call, Harris received a notice in the mail saying that her failure to pay the fine resulted in an increase in the amount she owed and that her driver's license had been suspended. After this lawsuit was filed, Harris' license was subject to suspension on three new grounds unrelated to her failure to pay the court debt stemming from her impeding traffic charge.

Michigan's Secretary of State, Jocelyn Benson ("Secretary Benson"),[2] disputes Harris' account of her interaction with the Ferndale court. Secretary Benson claims that when Harris contacted the court in October 2016, she was given an extension to permit her to make a payment by November 7, 2016, and was informed that a payment by that deadline would give her another extension on the balance and keep her license from being suspended. But because Harris failed to make a payment, the Ferndale court entered default judgment against her on November 14, 2016, and her license was suspended. Secretary Benson claims that, had Harris contacted the Ferndale court again, the court would have made a payment arrangement with her to avoid the suspension of her license. In support of this claim, Secretary Benson provided the affidavit of

---

[2]This appeal was filed when Ruth Johnson held the office of Secretary of State of the State of Michigan. Pursuant to FRAP 43(c)(2) Automatic Substitution of Officeholder, the court has substituted her successor, Jocelyn Benson, as a party.

Linda Carroll, the Court Administrator for the Ferndale court, who explained that "[a]nyone that calls in and makes any type of payment will always be granted an extension." These repayment plans can be started at as little as $1 per payment. Carroll also claims that individuals are informed that they can raise their inability to pay at a show-cause hearing.

According to Harris, having her license suspended has been a burden, and she lacks the resources to pay her court debt. Although she receives disability benefits, she claims that, after accounting for living expenses, caring for her daughter, and paying off her medical debt, she lacks sufficient resources to pay the amount she owes in order to have her suspended license reinstated. Harris claims that, on account of her suspended license, among other consequences, she struggles to attend her regular medical appointments.

Plaintiffs brought a putative class action under 42 U.S.C. § 1983 against Secretary Benson for unlawfully suspending their driver's licenses. Plaintiffs sought injunctive relief, claiming that Secretary Benson's suspension of the driver's licenses of the indigent who are unable to make payments violates the Equal Protection and Due Process Clauses of the Constitution. The district court found only one of Plaintiffs' constitutional claims likely to succeed on the merits—Plaintiffs' procedural due process claim that they were constitutionally entitled to an "ability to pay" hearing prior to the deprivation of their driver's licenses. The current version of the preliminary injunction order issued by the district court is as follows:

> Defendant is enjoined from suspending any further driver's licenses of individuals because of nonpayment of any fine, cost, fee or assessment under Michigan Compiled Laws § 257.321a *unless and until* Defendant or another entity: (1) offers drivers the option to request a hearing where they have the opportunity to demonstrate their inability to pay a fine, cost, fee and/or assessment; (2) provides a hearing when requested; (3) provides reasonable notice to drivers of the hearing opportunity; and (4) institutes alternatives to full payment for those unable to pay (e.g. realistic payment plans or volunteer service).

## II.

Before reviewing the district court's preliminary injunction order on the merits, we must address Secretary Benson's four challenges to the district court's subject-matter jurisdiction.

*Standing*.  We review de novo the district court's conclusion regarding standing.  *Friends of Tims Ford v. Tennessee Valley Auth.*, 585 F.3d 955, 966 (6th Cir. 2009).  Secretary Benson challenges on two distinct grounds Plaintiffs' standing to bring suit.  First, Secretary Benson disputes Plaintiffs' factual account of the process the Ferndale court afforded to Plaintiffs.  The district court, following *Gentek Building Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320 (6th Cir. 2007), correctly held that Secretary Benson's factual dispute implicates the merits of Plaintiffs' claims, and therefore a factual inquiry into the allegations was inappropriate to determine standing.  Secretary Benson argues that *Gentek* is inapplicable because it concerned a motion to dismiss rather than what we have here—a standing challenge to a claim seeking injunctive relief.  This is a distinction without a material difference as *Gentek*'s holding—"a district court engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim"—applies equally in this situation.  491 F.3d at 330.

Second, Secretary Benson argues that Plaintiffs' claimed injury is not redressible.  For Article III standing, the relief sought by a plaintiff "must provide redress for the injury." *Parsons v. United States Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015).  The district court rightly found this requirement met by Plaintiffs insofar as "a favorable decision would remedy the violation of Plaintiffs' procedural due process rights . . . [and] puts Plaintiffs one step closer to regaining their driving privileges."  The district court acknowledged that "other impediments" may remain for Plaintiffs to regain their driver's licenses but held that the elimination of one substantial obstacle for Plaintiffs to regain their licenses constituted "substantial and meaningful relief" sufficient to render their claimed injury redressable.  The district court's conclusion was justified under Supreme Court precedent.  In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, the Court held that even if "[a]n injunction would not . . . guarantee that" a plaintiff will achieve his desired final outcome, the injunction will have provided constitutionally sufficient redress if it "removed" a "barrier" to doing so.  429 U.S. 252, 261 (1977).

*Rooker-Feldman*.  *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), hold that only the Supreme Court

may review judgments entered by state courts in civil litigation. The doctrine, therefore, bars a lower federal appellate court from reviewing a plaintiff's claim when a state court's judgment is the source of the plaintiff's injury. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-84 (2005).

Secretary Benson argues that Plaintiffs are appealing the adverse judgment of Michigan trial courts, thereby contravening the *Rooker-Feldman* doctrine. But the Michigan statute is clear—it is the Secretary who suspends licenses, even if the Secretary does so only after getting certain information from trial courts. Mich. Comp. Laws § 257.321a(2). As we explained in *McCormick v. Braverman*:

> The inquiry then is the source of the injury the plaintiff alleges in the federal complaint. If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third-party's actions, then the plaintiff asserts an independent claim.

451 F.3d 382, 393 (6th Cir. 2006). Plaintiffs' suit seeks review of Secretary Benson's suspension of their licenses regardless of the validity of any state court decision. The fact that state court decisions form part of the basis for the Secretary's suspension action is immaterial. *Id*. at 394 ("To the extent that Defendants argue that these claims, even though they do not assert injury from the state court judgments, are 'inextricably intertwined' with those judgments so as to fall within the reach of *Rooker-Feldman*, that argument must fail.").

*Pullman* and *Younger*. Secretary Benson argues that the district court should have abstained from exercising jurisdiction over Plaintiffs' claims under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), and *Younger v. Harris*, 401 U.S. 37 (1971). *Pullman* abstention instructs courts to avoid exercising jurisdiction in cases involving an ambiguous state statute that may be interpreted by state courts so as to eliminate, or at least alter materially, the constitutional question raised in federal court. *Jones v. Coleman*, 848 F.3d 744, 749-50 (6th Cir. 2017). Secretary Benson argues that because Michigan law already requires the protection of federal constitutional rights when driver's licenses are suspended,[3] state courts

---

[3]*See* Mich. Comp. Laws § 257.323(4) ("The court shall set aside the secretary of state's determination only if 1 or more of following apply: (a) In determining whether a petitioner is eligible for full driving privileges, the

might interpret the challenged law in a way that would eliminate the constitutional question. But the Supreme Court has rejected applying *Pullman* abstention on those grounds. *See Zwickler v. Koota*, 389 U.S. 241, 251 (1967) (explaining that *Pullman* "abstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim").

The *Younger* abstention doctrine, meanwhile, cautions federal courts against exercising jurisdiction in cases where they are asked to enjoin pending state proceedings. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 364 (1989). But the district court did no such thing. There are no ongoing state proceedings here, only hypothetical proceedings that Secretary Benson claims Plaintiffs may pursue.

*Declaratory relief*. Secretary Benson also claims that the district court abused its discretion by holding that it had jurisdiction to decide Plaintiffs' request for declaratory relief. But no declaratory judgment has been issued, and our holding on the merits below moots the possibility that one will be issued.

### III.

*Standard of Review*. Having established that the district court properly exercised jurisdiction over Plaintiffs' claim, we now review the merits of the district court's decision granting a preliminarily injunction against Secretary Benson. While the party seeking a preliminary injunction "is not required to prove his case in full at a preliminary injunction hearing," *Cert. Rest. Dry Cleaning Network L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted), it remains the case that preliminary injunctions are an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Courts determine whether a party moving for a preliminary injunction has made that showing by weighing whether the party (1) "establish[ed] that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief,"

---

petitioner's substantial rights have been prejudiced because the determination is any of the following: (i) In violation of the Constitution of the United States.").

(3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id*. at 20. However, in a case such as this, where "a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits will often be the determinative factor." *Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013) (citation omitted).

We review for abuse of discretion the district court's decision to grant a preliminary injunction, but we review de novo conclusions of law—such as whether Plaintiffs are likely to succeed on the merits—that undergird the district court's decision. *See City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc).

**A.**

We begin by reviewing the district court's legal conclusion that Plaintiffs were likely to succeed on the merits of their procedural due process claim. The Fourteenth Amendment prohibits "any State" from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Plaintiffs claim that they have been deprived of a property interest—their driver's licenses—without due process of law. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

As a threshold matter we must acknowledge that Plaintiffs do not claim merely a general property interest in a driver's license; their specific claim is to a property interest, as indigent individuals, in maintaining their driver's licenses when state law requires they be suspended due to unpaid court debt. Identifying with specificity the nature of the claimed property interest makes a difference, as shown in *Roth*. There, a college professor's one-year teaching contract expired and was not renewed. He claimed that the university's failure to provide him with any notice or opportunity for a hearing concerning its decision not to retain him violated his right to procedural due process. The district court was persuaded. After finding that the professor's interest in retaining his job constituted a property interest (created by the public university's

employment contract with the professor) within the contours of the Fourteenth Amendment's Due Process Clause, the district court deployed a balancing test weighing the relative interests of the professor and the university and concluded that the university should have provided notice and an opportunity for a hearing before deciding not to retain the professor. *Id.* at 570. The Supreme Court had previously held that a teaching position at a public university can constitute a property interest "that is safeguarded by procedural due process." *Id.* at 576 (collecting cases). The *Roth* Court, however, reversed the district court, explaining that the "[professor]'s 'property' interest in employment at Wisconsin State University-Oshkosh was created and defined by the terms of his appointment." *Id.* at 578. The terms of the professor's contract with the state university were akin to a property interest created by a statutory entitlement. *Id.* Looking to those terms, the Court concluded they did not create a property interest protected by the Fourteenth Amendment:

> Those terms secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent 'sufficient cause.' Indeed, they made no provision for renewal whatsoever. . . . In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

*Id.* at 578.

Similarly here. Supreme Court case law recognizes a protectible property interest in a driver's license under state law. *Mackey v. Montrym*, 443 U.S. 1, 10 n.7 (1979). And indeed, Michigan's license-suspension scheme recognizes such an interest by providing notice and an opportunity to be heard if a license holder wants to challenge his underlying liability for a traffic violation or the misapplication of a fine. Mich. Comp. Laws § 257.321a(1)-(3). But the mere fact that a driver has a property interest in his license (or an interest in continued employment as a professor) under the Fourteenth Amendment does not answer the more particular question of whether Michigan law creates the specific property entitlement Plaintiffs claim. *Roth* illustrates the point because its holding depended on examining the nature of the claimed property interest (in continued employment) and seeing if the professor enjoyed an entitlement to that interest

under the relevant law.  In that case, the terms of the professor's employment contract with the public university showed he lacked an entitlement to continued employment.

State law was likewise dispositive in *Bell v. Burson*, where the Court held that because Georgia's statutory scheme made "liability [for an accident] an important factor in the State's determination to deprive an individual of his licenses, the State may not, consistently with due process, eliminate consideration of that factor in its prior hearing."  402 U.S. 535, 541 (1971). The Court also made clear that if "fault and liability [were] irrelevant to [Georgia's] statutory scheme," then the absence of any hearing on liability "would be appropriate to the nature of the case." *Id*. (citation omitted); *see also Memphis Light, Gas, and Water Div. v. Craft*, 436 U.S. 1 (1978) (holding that Tennessee law established a right not to have utility services terminated except for good cause and therefore that the absence of any pre-termination opportunity for a hearing violated procedural due process).

Here, as in *Roth*, *Bell*, and *Memphis Light*, we must ask whether state law establishes the entitlement that Plaintiffs' claim in this case—a right of the indigent, who cannot pay court debt, to be exempt from driver's-license suspension on the basis of unpaid court debt.[4]  The answer is it has not.

Neither the district court nor Plaintiffs identify any legal authority showing that Michigan law directs anyone to consider a license holder's indigency as part of the process of suspending his driver's license for failure to pay court debt.  On the contrary, Plaintiffs' central argument throughout this litigation has been that "[Michigan] law—enforced by the Secretary—that mandates suspensions for failure to pay court debt *with no exception for indigence or non-willfulness*."  Plaintiffs' whole point is that Michigan's statutory scheme does *not* create such an entitlement.

And that reading of Michigan law appears to be right.  Michigan's statutory scheme for license suspension makes no reference to the indigency status of those whose licenses are subject to suspension. *See e.g.*, Mich. Comp. Laws § 257.321a(2) ("If the person fails to appear or fails

---

[4]We hold aside, for the moment, the question of whether such an entitlement can be found in the Equal Protection Clause of the Fourteenth Amendment, which we address in Part III.B.

to comply with the order or judgment within the 14-day period, the court shall, within 14 days, inform the secretary of state, who shall immediately suspend the license of the person.").[5]

Because Plaintiffs do not claim a legal entitlement that falls within the Fourteenth Amendment's protection of property, there is no need to proceed, as the district court did, to the balancing test laid out in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Roth*, 408 U.S. at 570-71 ("[A] weighing process has long been a part of any determination of the form of hearing required in particular situations by procedural due process. But, to determine whether due

---

[5]Secretary Benson's approach to this litigation, meanwhile, muddies the waters. At first glance, one might think that Secretary Benson has in fact conceded that a pre-deprivation indigency hearing is currently required under state law. A more discerning look reveals that she made no such claim.

Secretary Benson argues that Plaintiffs neglected to pursue an "ability to pay" hearing at the Ferndale court that ultimately sent the information to Secretary Benson that triggered their license suspension. Secretary Benson maintains that Plaintiffs have not shown that the Ferndale court fails to provide what Plaintiffs request—"extensions for defendants who are unable to pay the full amount." As a consequence, says Secretary Benson, Plaintiffs are barred from pursuing their procedural due process claim because they never took advantage of the process provided.

This argument does not concede that *Michigan law* clearly entitles Plaintiffs to an indigency exception. Secretary Benson's account of the process Plaintiffs failed to pursue relies on an affidavit from Linda Carroll, the Court Administrator for the 43rd District Court-Ferndale Division. The Carroll affidavit says nothing about Michigan law, and more specifically it says nothing about the Michigan laws that the district court enjoined Secretary Benson from enforcing. Instead, the Carroll affidavit says that there are court rules or policies with provisions "for night court (to allow an opportunity to appear in court without conflicting with work schedules), extensions on payment requirements, ability to pay hearings, payment plans, as well as alternative payment options which include community service."

But there are two problems with the Carroll affidavit with respect to Plaintiffs' procedural due process claim. First, even if the process accounted for in Carroll's affidavit can serve as a body of law creating a legal entitlement to an "ability to pay" hearing, Plaintiffs' argument runs into a still more fundamental problem—their suit names the wrong party. Any injunction aimed at getting adequate notice of an available "ability to pay" hearing would need to be directed at either the 43rd District Court or the Clerk's office. Whether such a claim would be likely to succeed is another matter for another day.

Second, it is doubtful whether the process described in the affidavit amounts to a legal entitlement of any sort. The affidavit does not describe or cite the "provisions" to which it refers. When the affidavit refers to the specific "ability to pay" procedures of the court, they are described in discretionary terms as things that "the Clerk's office will" do. Moreover, it appears from the Carroll affidavit that the procedures the Clerk makes available may be in tension with other court rules:

> Although court rules generally state that fees, costs and other financial obligations imposed by the court must be paid at the time of assessment, for individuals present in court, the Clerk's office will: [lists relevant procedures].

Whatever the Carroll affidavit shows vis-à-vis the local rules or office practices of the 43rd District Court-Ferndale Division, it does not show that Michigan law establishes a right to an indigency exception from license suspension. The discretionary actions of a court administrator, or even a state judge, in adopting an administrative process, do not amount to the statutory entitlement the Supreme Court has acknowledged as a legitimate basis for a procedural due process claim. Upon so flimsy a basis as that we could not conclude that "looking to the operation of the State's statutory scheme, it is clear that [indigency] . . . plays a crucial role . . . ." *Bell*, 402 U.S. at 541.

process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake.") (footnote and citation omitted).  Plaintiffs' procedural due process claim fails.

The same result would hold true even if we were to proceed to the *Mathews* analysis, as the dissent argues we should.  The reason is simple.  If Plaintiffs' indigency is not relevant to the state's underlying decision to suspend their licenses, then giving them a hearing—or any other procedural opportunity—where they can raise their indigency would be pointless.  Such a procedure would do nothing to prevent the "the risk of erroneous deprivation." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  The Court's driver's-license-due-process cases recognize this basic truth.  For instance, as explained above, *Bell*'s conclusion specifically hinged on whether state law made the factor at issue relevant to the license-suspension decision.  402 U.S. at 541.  Likewise, *Dixon* rejected a due process challenge because the plaintiff conceded that he had no substantive basis to contest the license-suspension decision.  *Dixon v. Lowe*, 431 U.S. 105, 113–14 (1977).  That concession meant plaintiff's requested hearing "might make [him] feel that he has received more personal attention, but it would not serve to protect any substantive rights."  *Id.* at 114.  The Due Process Clause "does not protect procedure for procedure's sake." *Rector v. City and County of Denver*, 348 F.3d 935, 943-44 (10th Cir. 2003).  Here, Plaintiffs' requested indigency hearing would be exactly that, absent a showing that indigency is relevant to the license-suspension decision under Michigan law.

The dissent does not argue otherwise.  Instead, the dissent claims that indigency *is* relevant under Michigan law.  But as explained above, neither the dissent nor any party cites to anything in Michigan law establishing an indigency exception, and in fact the *Plaintiffs themselves* argue that Michigan law does *not* have one.  *See* supra note 5 and accompanying text.  Of course, if Michigan law *did* have an indigency exception—for instance, if Michigan law prohibited the Secretary from suspending the driver's license of an indigent person—this case would look very different.  Under that scenario, a suspension procedure that wholly failed to consider a person's indigency would violate due process.  But that is not the case before us.  Instead, the record does not establish this critical point, and therefore we cannot justify the "extraordinary and drastic remedy" of a preliminary injunction. *Munaf*, 553 U.S. at 689; *see also*

*North Carolina v. Covington*, 137 S. Ct. 1624, 1626 (2017). Plaintiffs have not shown that their procedural due process claim is likely to succeed on the merits.

**B.**

Plaintiffs have two more arrows in their quiver, both aimed at showing that Michigan's driver's-license-suspension scheme violates their Fourteenth Amendment rights to equal protection of the law. They argue that Secretary Benson's suspension of their licenses constitutes impermissible wealth discrimination under *Griffin v. Illinois* and its progeny. They also claim a violation of their rights against extraordinary debt collection, as established under *James v. Strange*. The district court found Plaintiffs' arguments unlikely to succeed. As do we.[6]

*The Griffin Framework.* Plaintiffs argue that Michigan's driver's-license-suspension scheme violates the Fourteenth Amendment as interpreted under *Griffin v. Illinois*, 351 U.S. 12 (1956), and the cases following it: *Williams v. Illinois*, 399 U.S. 235 (1970), *Tate v. Short*, 401 U.S. 395 (1971), *Mayer v. City of Chicago*, 404 U.S. 189 (1971), and *Bearden v. Georgia*, 461 U.S. 660 (1983). Plaintiffs argue that, under these cases, the challenged law is subject to something more than rational basis review. Alternatively, they argue that Michigan's laws cannot survive even rational basis review as they are manifestly "irrational and counterproductive when applied to indigent drivers." Both arguments are unavailing.

First, the district court correctly distinguished the *Griffin* cases from Plaintiffs' claims because none of the *Griffin* cases concerned a property interest. Those cases dealt with basic features of the criminal justice system—imprisonment, probation, and appeals.[7] Property

---

[6]If found likely to succeed on these claims, Plaintiffs would have resuscitated the district court's conclusion on the procedural due process claim because they would have identified a legal entitlement in federal constitutional law that triggers the Due Process Clause. Of course, they would still have to show that the procedures in place are constitutionally inadequate, an issue we do not address.

[7]*Griffin*, through divided opinions, held that Illinois violated both the Equal Protection and Due Process Clauses of the Fourteenth Amendment by failing to furnish trial transcripts to indigent criminal defendants who needed transcripts in order to file an appeal. Justice Black's opinion explained that by doing so, Illinois "den[ied] adequate appellate review to the poor while granting such review to all others." 351 U.S. at 13 (plurality). *Williams*, in turn, relied on *Griffin* in concluding that a court could not increase an indigent defendant's imprisonment past her maximum sentence solely on the grounds that the defendant could not afford to pay fines stemming from the original conviction. 399 U.S. at 242. In *Tate*, the Supreme Court decided a case concerning a debtor who had failed to pay fines accumulated from traffic offenses and had, as a consequence, been committed by a court to a municipal farm where he would work "to satisfy the fines at the rate of five dollars for each day."

interests are not due the same degree of legal protection as the fundamental liberty interests implicated in the *Griffin* line of cases.  As a judge from one of our sister circuits said well:

> The Due Process Clause applies to both liberty and property.  When there is a distinction, property receives the lesser protection.  The burden at a criminal trial, where liberty is at issue, is "beyond a reasonable doubt"; the burden at a civil trial involving property, by contrast, is "preponderance of the evidence."  In a criminal trial that can end in a sentence of imprisonment, the defendant is entitled to counsel at public expense if he cannot afford a lawyer; in a civil trial, by contrast, a defendant who cannot afford a lawyer must represent himself.  The list could be extended, but the point has been made.  Liberty receives the greater protection.

*Markadonatos v. Vill. of Woodridge*, 760 F.3d 545, 554 (7th Cir. 2014) (Easterbrook, J., concurring).

Cases cited by Plaintiffs do not show otherwise.  True, the Supreme Court held in *Mayer* that an indigent defendant seeking to appeal a nonfelony conviction that did not entail imprisonment was as entitled to access his trial transcripts as an indigent defendant seeking to appeal a conviction punishable by imprisonment.  404 U.S. at 195-98.  That holding does not, however, undermine the critical distinction between liberty and property interests.  An indigent defendant's interest in accessing an appeal to challenge a finding of his criminal liability is not the same as an indigent person's property interest in a driver's license.

Plaintiffs' reliance on *Bearden* is likewise misplaced.  They cite *Bearden* for the proposition that Secretary Benson's refusal to exempt those who are *willing* but *unable* to pay violates "the fundamental fairness required by the Fourteenth Amendment."  The *Bearden* Court, however, merely held that the *automatic* revocation of a defendant's probation (thereby sending him to jail) because of non-payment of a fine serves no legitimate penological interest unless the sentencing judge inquires further into whether the defendant's non-payment reflected an unwillingness rather than an inability to pay.  461 U.S. at 670-73.  *Bearden*, then, concerns what

---

401 U.S. at 397.  The Supreme Court found that this situation fell within *Williams'* holding because the "petitioner was subjected to imprisonment solely because of his indigency."  *Id*. at 398.  *Mayer* extended *Griffin*'s right of indigent defendants to an appellate record to cases where a defendant seeks to appeal a conviction that threatens fines, not imprisonment.  404 U.S. at 196.  Lastly, in *Bearden* the Court held that Georgia's law permitting probation to be revoked due to a probationer's inability to pay a fine (without a finding of fault or inquiry into alternative forms of punishment) violated the Fourteenth Amendment under *Griffin*.  461 U.S. at 672-73.

kind of process is due before a probationer is subject to confinement, not what kind of process is due before a driver's license is subject to suspension.

Second, contrary to Plaintiffs' claims, their challenge to Michigan's driver's-license-suspension scheme is subject to rational basis review. We review equal protection challenges to laws on grounds of "wealth-classification" only to see if they have a rational basis. *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 660 (6th Cir. 2008) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973)) ("[W]ealth discrimination alone does not provide an adequate basis for invoking strict scrutiny."). We explained in *Johnson v. Bredesen* that equal protection challenges to laws that "neither implicate[] a fundamental right nor target a suspect class" are subject to rational basis review. 624 F.3d 742, 746 (6th Cir. 2010). Michigan's challenged statute is such a law.[8]

Third, Michigan's driver's-license-suspension scheme passes rational basis review. "A 'plaintiff may demonstrate that the government action lacks a rational basis either by negating every conceivable basis . . . which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will.'"

---

[8]First, Plaintiffs' claim does not implicate a fundamental right. Plaintiffs concede that we have held "there is no fundamental right to drive," *Duncan v. Cone*, 2000 WL 1828089, at *2 (6th Cir. Dec. 7, 2000), but nonetheless claim that Michigan's suspension of their driver's licenses implicates the fundamental right to travel because, for the indigent, especially where public transit is inadequate and distances between work, home, and market are great, an inability to drive "actually deters travel." Plaintiffs' argument is misguided. A right only counts as fundamental when it is "traditionally protected by our society" and "rooted in the traditions and conscience of our people." *Michael H. v. Gerald D.*, 491 U.S. 110, 122-23 (1989) (citation omitted). A putative right of the indigent to drive—even in in a car-bound society where public transit may be woefully inadequate—is not a right rooted in the traditions and conscience of our people.

None of the authority cited by Plaintiffs indicates otherwise. The language "actually deters travel" comes from *Attorney Gen. of New York v. Soto-Lopez*, in which a plurality of the Court stated that "[a] state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." 476 U.S. 898, 903 (1986). *Soto-Lopez* is not itself instructive because the Court did not rely on the "actually deters travel" language in reaching its holding. The authority relied upon by *Soto-Lopez* for the "actually deters travel" language was *Crandall v. Nevada*, 6 Wall. 35 (1867), and *Shapiro v. Thompson*, 394 U.S. 618 (1969). Neither case is relevant to Plaintiffs' claim. *Shapiro* concerned state laws denying welfare assistance to residents who had not resided within their jurisdiction for at least one year before applying for welfare assistance. *Crandall* dealt with a Nevada law that imposed a capitation tax on all passengers leaving or passing through the state.

Second, Michigan's law does not target a suspect class. "[A] class of less wealthy individuals is not a suspect class warranting strict scrutiny review." *Molina-Crespo*, 547 F.3d at 660 (citation omitted); *see also Johnson*, 624 F.3d at 746.

*Johnson*, 624 F.3d at 747 (citation omitted).  Plaintiffs do not argue the latter, so we are left with the question of whether Plaintiffs have met their burden by showing that they are likely to succeed in refuting "every conceivable basis" for Michigan's driver's-license-suspension scheme.  To qualify as having a rational basis, the challenged law "need only be rationally related to legitimate government interests."  *Id*. at 746 (citation omitted).

It is no struggle to conceive of the legitimate government interests pursued by a law suspending driver's licenses for nonpayment of court debt.  The state has a general interest in compliance with traffic laws.  By imposing greater consequences for violating traffic laws, the state increases deterrence for would-be violators.  The state also has legitimate interests in promoting compliance with court orders and in collecting traffic debt.  *See id*. at 747; *see also Blackhawk Mining Co., Inc., v. Andrus*, 711 F.2d 753, 757 (6th Cir. 1983) (holding that a law requiring prepayment of fines before an adequate hearing was justified because "the government's interest in prompt assessment and collection of civil penalties to ensure compliance with the Act is substantial").

Plaintiffs maintain that suspending the driver's license of an indigent license holder for nonpayment is patently irrational because doing so makes it harder for him to obtain and hold a job, which in turn makes him less likely to pay his court debt.  Perhaps Plaintiffs are right that the policy is unwise, even counterproductive.  But under rational basis review we ask only whether Michigan's statutes are "rationally related to legitimate government interests."  *Johnson*, 624 F.3d at 746.  Michigan's choice to wield the cudgel of driver's-license suspension for nonpayment of court debt dramatically heightens the incentive to pay.  Such a policy is rationally related to "the government's interest in prompt assessment and collection of civil penalties." *Blackhawk Mining*, 711 F.3d at 757.  That this policy may in many cases make that—now more highly incentivized—payment harder to accomplish does not show that the law lacks a rational basis.  "Misguided laws may nonetheless be constitutional. . . . Our task . . . is not to weigh this statute's effectiveness but its constitutionality."  *James v. Strange*, 407 U.S. 128, 133-34 (1972).

*Plaintiffs' Extraordinary Debt Collection Claim*.  Lastly, Plaintiffs claim that Michigan's license-suspension scheme violates their constitutional right against extraordinary debt collection under *James v. Strange*.  In *Strange*, the Supreme Court struck down a Kansas recoupment

scheme that required indigent criminal defendants who were afforded counsel at public expense to repay those expenses. *Id*. at 129-31. The *constitutional* defect with this policy was that it "strip[ped] from indigent defendants the array of protective exemptions Kansas has erected for other civil judgment debtors, including restrictions on the amount of disposable earnings subject to garnishment, [etc.]." *Id*. at 135. The Court found this disparity not just when comparing indigent defendants to private debtors, but also when comparing indigent defendants to individuals who owed debts to the state for public assistance. *Id*. at 136-37.

Plaintiffs cite *Strange* for the proposition that Secretary Benson may not, consistent with the Equal Protection Clause, "subject[] [Plaintiffs] to a significantly harsher collection method than people who owe other types of debt." Michigan law violates this principle, according to Plaintiffs, because their licenses are suspended due to their court debt, while "people with unpaid private debt do not face license suspension."

The district court correctly rejected this argument under *Fuller v. Oregon*, 417 U.S. 40 (1974). The problem that *Strange* identified, according to the *Fuller* Court, was "the elimination of exemptions normally available to judgment debtors." *Id*. at 47. Here, there is no dispute that the challenged Michigan statutes do not eliminate any such exemptions. Moreover, the State is uniquely empowered to grant, suspend, or reinstate driver's licenses. Supreme Court precedent does not require anything like exact parity between the State and private creditors in this regard. The Court in *Strange* said: "[w]e recognize, of course, that the State's claim to reimbursement may take precedence, under appropriate circumstances, over the claims of private creditors and that enforcement procedures with respect to judgments need not be identical." 407 U.S. at 138. It would be passing strange indeed to interpret *Strange* as putting Michigan to the choice of either giving up its right to suspend the licenses of those with unpaid court debt or empowering private creditors to suspend the driver's licenses of those indebted to them.

In any event, laws challenged under *Strange* are subject to rational basis review. *Johnson*, 624 F.3d at 746. As established above, Michigan's statutory scheme is rationally related to legitimate government interests.

## C.

As we have held before "[b]ecause the district court committed an error of law—on the all-important likelihood-of-success factor, no less—it abused its discretion in granting a preliminary injunction." *Southern Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 854 (6th Cir. 2017). The district court here erred in finding Plaintiffs likely to succeed on the merits and therefore abused its discretion in granting Plaintiffs' requested preliminary injunction. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits will often be the determinative factor.").

## IV.

We **REVERSE** the judgment of the district court and **REMAND** for proceedings consistent with this opinion.

---

**DISSENT**

---

BERNICE BOUIE DONALD, Circuit Judge, dissenting.**[1]**  The question before us is whether Michigan may, in accord with due process, impose an automatic license-suspension-scheme on indigent drivers for failure to pay court fines without regard to their ability to pay and without affording them reasonable payment alternatives.  In my view, it may not.

The Supreme Court has long recognized a protected property interest in the continued possession of a driver's license.  *See Bell v. Burson*, 402 U.S. 535, 539 (1971).  Once issued, it cannot "be taken away without that procedural due process required by the Fourteenth Amendment."  *Id*.  Yet, on its own account and without the benefit of briefing by the parties,**[2]** the majority recasts the Plaintiffs' claims as seeking "a [new] property interest" in an indigency exception, one the majority concludes Plaintiffs have "no claim of legal entitlement."  Maj. Op. 8, 11.  The majority's analysis relies solely upon its determination that "Michigan law" does not "establish[] [an] entitlement . . . right of the indigent . . . to be exempt from driver's license suspension," and thus the majority finds "no need to proceed . . . to the balancing test laid out in *Mathews v. Eldridge*, 424 U.S. 319 (1976)."  Maj. Op. 8, 11.

The majority commits two critical errors.  First, it ignores age-old Supreme Court precedent that squarely recognizes a protected property interest in the continued possession of a driver's license and proceeds as if Plaintiffs must establish a more specific property interest.  Second, and relatedly, it relies solely on Michigan's deprivation procedures to define the extent of Plaintiffs' property interests.  *See* Maj. Op. 10 ("Michigan's statutory scheme for license suspension makes no reference to the indigency status of those whose licenses are subject to suspension.").  This puts the cart before the horse.  Indeed, the Supreme Court has repeatedly

---

**[1]**I agree with the majority that Plaintiffs have standing to bring this action and that we need not abstain under the *Younger* or *Pullman* doctrines from reaching the merits of Plaintiffs' claims.

**[2]**The Secretary does not dispute Plaintiffs' claim that Michigan must provide them a hearing to contest their ability to pay and seek alternatives before it suspends their driver's licenses, much less contend Plaintiffs have no claim of entitlement for which to challenge their suspensions.  Tellingly, of the Secretary's seventy-three-page brief, she devoted only three pages to due process.

admonished courts not to define a property interest by its deprivation procedures. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty."). Thus, the majority's approach contravenes binding precedent and stifles fundamental due process protections.

Under the proper due process framework, I believe Plaintiffs have an uncontroverted property interest in the continued possession of their driver's licenses. This principle holds true without regard to the procedures a state establishes for its deprivation. Balancing the relevant interests, Michigan's license-suspension scheme—mandating the suspension of driver's licenses for failure to pay, without consideration of a person's ability to pay—violates Plaintiffs' procedural due process rights. I respectfully dissent.

## I.

The facts are largely undisputed. Michigan imposes fines for traffic violations. If those fines are not paid within 14 days from the notice of suspension, Michigan law instructs the Secretary to "immediately suspend" the person's driver's license.[3] A driver is notified for the first time that his or her driver's license is subject to suspension 28 days after he or she fails to pay.

Adrian Fowler and Kitia Harris are indigent and unable to pay the fines that resulted from their traffic infractions. Fowler, a single mother, works part-time and earns $712 each month. Fowler alleges she turned down a better employment opportunity because it required her to travel through the metropolitan area, something she cannot do without a driver's license or suitable public transportation. She also contends that her inability to drive has reduced the likelihood that she will be able to pay her fines. Harris, also a single mother, suffers from a chronic medical condition and receives disability benefits in the amount of $1,218 each month. Harris alleges that, because she is unable to stand for long periods of time due to her health, she cannot use

---

[3]In addition to fines, a driver is also subject to court costs of up to $100 and a mandatory assessment fee of $40. Mich. Comp. Laws § 257.907(4), (13). The statute further provides that a 20% late fee be imposed on any amount unpaid after 56 days. *Id.* § 600.4803. Finally, a person "who fails to . . . pay[] all fines, costs, fees, and assessments, is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $100.00, or both." *Id.* § 257.321a(1).

public transportation and is unable to attend many of her doctor's appointments. Fowler and Harris both tried to establish a payment plan to pay their fines, but Michigan courts refused.

The Secretary does not dispute that Plaintiffs are indigent and unable to pay their fines. Nor does the Secretary contest that due process requires that Plaintiffs receive notice and an opportunity to demonstrate that they are unable to pay. To these points, the Secretary emphatically agrees. Rather, the Secretary contends that Plaintiffs' procedural due process rights are satisfied because Michigan *does* permit drivers to assert their inability to pay and seek alternatives, and that Plaintiffs would have been provided notice of the available procedures had they appeared in court for the underlying traffic violation. [4]

The Due Process clause safeguards against a state's impermissible deprivation of a protected property interest. Under the due process analysis, we consider two primary questions: whether the plaintiff has a liberty or property interest entitled to due process protection; and if so, whether the plaintiff was provided sufficient notice and afforded an opportunity to present objections. *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950) (citing *Milliken v. Meyer*, 314 U.S. 457, 463 (1940)). "Property interests are . . . created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Once it is determined that a property interest exists, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

The first question under the due process framework is forthright: The Supreme Court has long recognized that "[o]nce [driver's] licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood . . . [and they] are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell*, 402 U.S. at 539 (citation omitted); *Mackey v. Montrym*, 443 U.S. 1, 10 (1979) (same); *Dixon v. Love*,

---

[4]Despite these averments, in the majority's view, the Secretary "does not concede that *Michigan law* clearly entitles Plaintiffs to an indigency exception." Maj. Op. 11 n.5 (emphasis in original). Rather, according to the majority, the Secretary merely states the "rules or policies" of *Michigan courts* as provided by the court administrator. Maj. Op. 11 n.5. The record, however, belies this contention. According to the Secretary, "[o]fficial state records . . . show that the opportunity to raise an ability to pay for the enforcement of a court order is provided by Michigan courts under *existing law*." R. 33, at 465 (emphasis added). The "existing law" the Secretary references is surely that of Michigan. Thus, the Secretary's concession is unequivocal.

431 U.S. 105, 112 (1977) (same). There is—without question—a property interest in the continued possession of a driver's license. Therefore, the only question remaining in the due process analysis is what process is due before Michigan may suspend the driver's license of an indigent person for failure to pay fines. *Morrissey*, 408 U.S. at 481. The factors set forth in *Mathews* provide the framework for determining the specific dictates of due process.

Despite clearly established law, the majority concludes that Plaintiffs have no entitlement right at all to challenge their license suspensions on the basis that they are indigent. According to the majority, "the mere fact" that the Supreme Court has "recognize[d] a protectable property interest in a driver's license under state law," does not create the "more specific" entitlement interest in an indigency exception from license suspension. Maj. Op. 9. The majority's analysis rests entirely on its misapprehension of the Supreme Court's decision in *Roth*.

The Supreme Court in *Roth* held that a professor who was hired on a fixed term of one academic year did not have a protected property interest in continued employment after his contract ended. *Roth*, 408 U.S. at 578. The majority reads *Roth* to suggest that the specific "nature of the claimed property interest" by Plaintiffs' here is an indigency exception, not in continued possession their driver's licenses. This misreads *Roth*.

The majority observes correctly that *Roth* looked to the "nature of the interest at stake" to determine whether the Plaintiff had a protected property interest. *Id.* at 570–71. Missed by the majority, however, is that *Roth* looked to the professor's employment contract—the "rules or understanding" that conferred the underlying property interest—to determine the nature of the interest. *Id.* at 577–78. According to *those* terms, the Court explained that "the important fact" was that the plaintiff's employment contract "specifically provided that . . . [his] employment was to terminate on June 30" and that "they made no provision for renewal whatsoever." *Id.* at 578. Only then did the Court in *Roth* find that no property interest existed. Thus, *Roth* stands for the principle that due process does not protect against the deprivation of a continued interest in property where state rules or regulations do not confer such an interest in its continued possession. *Id.* at 573.

The majority likens the one-year teaching contract in *Roth* to the Plaintiffs' property interest in continued possession of their driver's licenses.  This comparison falls short.  Central to *Roth*'s holding was that the plaintiff had no "no tenure rights to continued employment."  *Id.* at 566, 576–77 (distinguishing the plaintiff's one-year contract from cases where a property interest existed in the continued employment of public college professors employed under "tenure provisions") (citations omitted).  Whereas here, the Supreme Court has held that there is a property interest in the "continued possession" of a driver's license and that it may "not to be taken away without that procedural due process."  *Bell*, 402 U.S. at 539 (citation omitted).  Employing *Roth*, there is no question that the nature of the property interest at stake here is the continued possession of Plaintiffs' driver's license.

In cases following *Roth*, the Court has held steadfast to the principle that the nature of the property interest at stake is ingrained in the rules or regulations that confer the underlying property interest, not in the state's deprivation procedures.  For example, in *Goss v. Lopez*, several high school students challenged Ohio's statute that permitted school officials to suspend students for 10 days for misconduct without providing students a pre-suspension hearing.  419 U.S. 565, 568–69 (1975).  To determine the nature of the interest at stake, the Court turned to the provision in Ohio's law that conferred the underlying right to a free education and concluded that the students "plainly had legitimate claims of entitlement to a public education."  *Id.* at 573.  Ohio's statutory provision that set forth the suspension procedures was immaterial to the nature of the property interest at stake.  *Id.* at 573–74.

This Court has since reiterated this principle in the clearest of terms:

> [T]he parties suggest two sources for [plaintiff's] property interest: the Village's procedure for evaluating requests for building permits and the building permit itself.  Of the two possible sources for the property interest at stake, only the latter is cognizable.  This Court has held that processes mandated by municipal ordinances or state law are insufficient to establish a property interest.

*Chandler v. Vill. of Chagrin Falls*, 296 F. App'x 463, 469 (6th Cir. 2008) (citing *Richardson v. Twp. of Brady*, 218 F.3d 508 (6th Cir. 2000)).  There is no question that, pursuant to controlling precedent, Michigan's license-suspension scheme should not be considered in evaluating the nature of the property interest at stake here.  *See Loudermill*, 470 U.S. at 541 ("In short, once it is

determined that the Due Process Clause applies, . . . the [answer to the] question [of] what process is due . . . is not to be found in the [state] statute.").

Compounding its foundational misapprehension of *Roth*, the majority then misreads the Supreme Court's decision in *Bell*, taking it to stand for the proposition that this Court should look to Michigan's license-suspension statute to determine whether "Michigan law" creates a claim of entitlement in an indigency exception. Maj. Op. 10. However, *Bell* does not support such an approach. In *Bell*, the plaintiff challenged Georgia's Motor Vehicle Safety Responsibility Act, which provided that the driver's license of an uninsured motorist involved in an accident would be suspended unless that motorist could post a security bond for the amount of damages claimed by a party to the accident. *Bell*, 402 U.S. at 536. The pre-suspension procedures under the Georgia statute excluded any consideration of fault or responsibility for the accident. *Id.* The Supreme Court held that the law's failure to afford an uninsured motorist a pre-suspension hearing on fault was constitutionally deficient. *Id.* at 543.

Although *Bell* canvassed the state's deprivation statute to determine whether the statutory scheme made "liability an important factor in the State's determination to deprive an individual of his licenses," it did so only to determine *what process was due*, not to define the plaintiff's property interest, as the majority does here. *Bell* began its analysis by first emphasizing the driver's protected property interest in the continued possession of his driver's license. *Id.* at 539 (citation omitted). Once the plaintiff's protected property interest was clearly established, only then did the Court "turn . . . to the nature of the procedural due process which must be afforded the licensee on the question of his fault or liability for the accident." *Id.* at 539–40. Despite the majority's averment to the contrary, the Court's examination of the state's license-suspension statute was of no consequence to its determination of whether the plaintiff had a claim of entitlement to continued possession of his driver's license.

Having established that Plaintiffs have a protected property interest in the continued possession of their driver's licenses, "the question remain[ing] [is] what process is due." *Morrissey*, 408 U.S. at 481. At a minimum, due process requires that Michigan provide notice "reasonably calculated, under all the circumstances, to apprise [Plaintiffs] of the pendency of the

action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314 (citation omitted).

Michigan did not provide Plaintiffs sufficient notice before it deprived them of their driver's licenses. Even assuming that the Secretary is correct in the assertion that Plaintiffs were provided alternatives to payment in full before having their licenses suspended, it sets forth no basis for its failure to provide Plaintiffs with "adequate notice" of the available alternatives in the statute, the citations, or through the court's website. *See Mathews*, 424 U.S. at 325 n.4 (explaining that the essence of due process requires "timely and adequate notice"). To satisfy the notice requirement under due process, Michigan must apprise drivers of the risk of having their licenses suspended if they fail to pay court fines and provide notice that they may contest their ability to pay by establishing that they are indigent and may seek alternatives to payment. It is undisputed that the only notice provided to Plaintiffs instructs them that they must pay the costs in full, unless a misdemeanor is involved, or they dispute liability of the traffic violation. Thus, Michigan fails to afford Plaintiffs constitutionally-sufficient notice before it suspends their driver's licenses for failure to pay.

Because, "unlike some legal rules," due process is "flexible" and "calls for such procedures as the particular situation demands," we weigh the factors set forth in *Mathews* to determine the scope of the hearing required:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews*, 424 U.S. at 334–35. Applying the balancing approach outlined in *Mathews*, Michigan's law violates procedural due process.

The first and third factors are simple. It is unquestionable that the private interests at stake are high when a state deprives a person of his or her driver's license. A driver's license can be a necessary element to maintaining a livelihood, and the Supreme Court has "frequently recognized the severity of depriving a person of the means of livelihood." *Loudermill*, 470 U.S.

at 543; *see also Bell*, 402 U.S. at 539 (recognizing that a driver's license may become "essential in the pursuit of a livelihood."). The impact of the deprivation is far more severe for indigent drivers whose precarious financial position only worsens without the ability to drive. *See United States v. Kras*, 409 U.S. 434, 460 (1973) (Marshall, J., dissenting) ("But no one who has had close contact with poor people can fail to understand how close to the margin of survival many of them are."). Certainly, an individual who has had their license suspended because they cannot afford to pay a fine is at an extraordinary disadvantage in earning an income and obtaining basic essentials. *See Wooley v. Maynard*, 430 U.S. 705, 715 (1977) ("[D]riving an automobile" is "a virtual necessity for most Americans."). Indeed, Fowler alleges she was forced to turn down a better-paying job after Michigan suspended her license, and Harris contends she is unable to regularly attend doctor's appointments.

On the other hand, the government's interests in suspending driver's licenses without a pre-deprivation hearing are minimal. The Secretary advances no argument that permitting the Plaintiffs to challenge their ability to pay fines before having their licenses suspended would cause undue fiscal or administrative burdens. Quite the opposite: the Secretary maintains that Michigan *does* provide a pre-deprivation hearing for a driver to contest his or her ability to pay. *See* Appellant's Br. at 50–51 ("[T]he process that was due was available to [the Plaintiffs], including pre-deprivation indigency accommodations.").

Finally, the risk of erroneous deprivation of the driver's license of a person who is truly unable to pay is far too great unless there are added procedures. The question of whether one is indigent would involve a fact-intensive inquiry that might require a driver to testify regarding their financial status and provide documentation. This is a small price to pay to avoid financial ruination of an indigent individual or family. Given the balancing of these factors, due process requires that Michigan provide drivers a pre-deprivation hearing to contest their license-suspension on the basis that they are indigent and to provide reasonable alternatives to payment. *See Bell*, 402 U.S. at 542 ("[E]xcept in emergency situations (and this is not one) due process requires that when a State seeks to terminate an interest [in a driver's license], it must afford

'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective.").**5**

The majority, on the other hand, concludes that "even if we proceed to the *Mathews* analysis," Plaintiffs' due process claim still fails for the same reason it concludes Plaintiffs have no property interest in the first instance: "indigency is not relevant to the state's underlying decision to suspend their licenses." Maj. Op. 12. The majority reads *Bell* and *Dixon* for the principle that a state's decision not to make a factor relevant to its deprivation scheme is dispositive under *Mathews*. Neither case can be stretched so far; it would render the balancing test in *Mathews* meaningless.

The Court in *Bell* affirmatively answered whether due process might still require a state to consider factors that were not relevant to its deprivation scheme. According to *Bell*, if fault and liability were "irrelevant to the [state's] statutory scheme," the specific "nature of the case" would dictate whether the state must nonetheless consider those factors. *Bell,* 402 U.S. at 541. In other words, the answer to this question depends on the "demands" of the "particular situation," which can only be determined by balancing the *Mathews* factors—a crucial step the majority foregoes. *Mathews*, 424 U.S. at 321. *Bell* provides no support for the majority's failure to apply *Mathews*.

Neither does *Dixon*. The majority, seizing upon a single phrase in *Dixon*—that the pre-deprivation hearing sought by the plaintiff "would not serve to protect any [of the plaintiff's] substantive rights" *id.* at 114—concludes that Plaintiffs have "no substantive basis to contest [Michigan's] license-suspension decision." Maj. Op. 12. The majority places more on this phrase than it can bear. First, the "only question" before the Court in *Dixon* was "one of timing." *See Dixon*, 431 U.S. at 112 (recognizing that it was "clear" that the licensee enjoyed "all the safeguards procedural due process could be thought to require . . . ."). Second, the phrase was

---

**5**The Secretary points to *Dixon v. Love*, 431 U.S. 105 (1977) and argues that a post-deprivation hearing alone is sufficient to comport with due process. *Dixon* does not support the Secretary's argument because the government interest in that case was more urgent and compelling than the government interest in this case. The scheme in *Dixon* targeted drivers who had accumulated a large number of traffic offenses, which gave rise to a reasonable inference that they were significantly more likely to pose a risk to public safety if allowed to remain on the road. In contrast, Michigan's license-suspension scheme relates solely to the collection of money. Under the *Mathews* factors, these different government interests justify different levels of process.

relative only to the Court's assessment of the risk-of-erroneous-deprivation factor under *Mathews*. *Id.* at 113–14. Considering this factor alone, the Court determined that the risk was minimal because the plaintiff did not challenge his convictions or the "adequacy of his procedural rights." *Id.* Unlike in *Dixon*, Plaintiffs' *do* challenge the adequacy of their procedural rights under Michigan law. The majority's comparison to *Dixon* fails.

What is more, the majority cannot escape that the *Dixon* Court upheld the state's pre-deprivation procedures only after carefully weighing each of the *Mathews* factors. *Id.* at 113. The majority's reliance upon a single phrase that related to only one of the three *Mathew*'s factors, while ignoring the Court's analysis of the remaining factors, falls short. *See Bd. of Curators of University of Mo. v. Horowitz*, 435 U.S. 78, 86 n.3 (1977) (weighing "all relevant factors" to determine the specific dictates of due process). The majority's approach skips over critical safeguards of due process.

## II.

Because I would affirm the district court on the basis that Michigan's license-suspension statute violates Plaintiffs' procedural due process rights, I would not reach the equal protection issue. However, because I also part ways with the majority's equal protection analysis, I write separately to express my divergent views.

At the outset, the fundamental principle pronounced in *Griffin v. Illinois*, 351 U.S. 12 (1956) and its progeny, guides our equal protection analysis. Namely, that a state may not subject an indigent person "who, by definition, is without funds," to a harsher punishment "solely because [they are] unable to pay." *Williams v. Illinois*, 399 U.S. 235, 242 (1970).

In *Griffin*, the Supreme Court invalidated an Illinois statute that required all defendants to purchase transcripts in order to appeal their convictions. *Griffin*, 351 U.S. at 13. Though facially neutral, it failed to "afford[] every convicted person, financially competent or not, the opportunity to take an appeal," because indigent persons were not provided an alternative mechanism to receive an adequate transcript. *Id.* at 23; *see also Williams*, 399 U.S. at 244 (invalidating an Illinois statute that required all persons to pay fines arising from their conviction before being released from jail without affording an exception for the indigent). Extending

*Griffin*'s principle, the Court in *Bearden v. Georgia*, 461 U.S. 660, 668–69 (1983) held that, absent evidence that the defendant "willfully refused" to pay or that "alternative methods of punish[ment]" are inadequate to meet the state's interest, the state could not constitutionally revoke the defendant's probation for failure to pay.

As its sole basis for distinguishing *Griffin*, the majority—relying on a single Seventh Circuit concurrence in *Markadonatos v. Vill. of Woodridge*, 760 F.3d 545, 554 (7th Cir. 2014) (Easterbrook, J., concurring)—contends that "property receives . . . less[] protection" than liberty interests. Maj. Op. 13–14. On this faulty foundation, the majority presumes that *Griffi*n is inapplicable here. Such sparse reasoning begs the question rather than answers it. That liberty interests receive a higher degree of protection than property is nearly inapposite to the more particular question of whether *Griffin* applies here. Certainly, when a state deprives an indigent person of their liberty, they are entitled to the full panoply of constitutional protections. But the majority does not explain why that means it must draw an arbitrary line between liberty and property here. In my view, when a state deprives a person of an essential source of livelihood, "solely because [they are] indigent and cannot immediately pay the fine in full," *Georgia*, 461 U.S. at 664, the principle set forth in *Griffin* is implicated.

To be sure, later cases reveal that *Griffin*'s principle cannot be so easily cabined to instances where imprisonment is at stake. Indeed, in *Mayer v. City of Chicago*, 404 U.S. 189, 196 (1971), the Court rejected the state's argument that *Griffin* was distinguishable because the defendant sought a fee exemption to obtain his transcript to appeal a judgment that resulted in only a civil fine. *Mayer* underscored *Griffin*'s holding that the refusal to allow an exception for the indigent was, as a constitutional matter, no different from adopting an "unreasoned distinction," punishing indigent individuals more severely than non-indigent individuals for reasons unrelated to their culpability. *Id.* at 196; *see also M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) (applying *Griffin* to the state's authority to terminate a parent-child bond); *Kras*, 409 U.S. at 445 (declining to extend *Griffin*'s principle to a fee waiver in the bankruptcy context because "not getting a discharge will effect no change with respect to basic necessities."). Certainly, depriving a person of the means to a "basic, pervasive, and often necessary mode of

transportation to and from one's home [and] workplace" implicates a basic and fundamental necessity for which *Griffin* should apply. *Delaware v. Prouse*, 440 U.S. 648, 662 (1979).

The majority concludes that Michigan's license-suspension scheme withstands rational basis review because Michigan "has legitimate interests in promoting compliance with court orders and in collecting traffic debt." Maj. Op. 15–16. Like the Courts in *Griffin*, *Bearden*, and *Mayer*, I find Michigan's license-suspension scheme problematic. It is difficult to rationalize— and, notably, the Secretary does not even attempt to do so—how suspending the driver's license of a person who is truly unable to pay makes it any more likely that Michigan will recover the costs it seeks to collect. Surely, suspending the driver's license of "someone who through no fault of his own is unable to [pay]" will not "make [payment] suddenly forthcoming." *Bearden*, 461 U.S. at 670. Indeed, the "reasons for non-payment [are] of critical importance here." *Id.* at 668. Thus, like *Bearden*, the high interests at stake warrant that Michigan "inquire into the reasons for [Plaintiffs'] failure to pay" and "consider alterna[tives]" to payment in full before it imposes an automatic suspension of licenses. *Id.* at 673.

### III.

Michigan's license-suspension scheme imposes a harsher sanction on indigent drivers than their non-indigent peers. Given the great degree of deprivation at stake, Michigan's failure to inquire into a driver's ability to pay and afford alternatives violates due process and equal protection. Because the majority's decision today erodes essential constitutional promises, I dissent!